Next on our docket is United States v. Brian Riggs. Good morning. Good morning, and take your time, but when you're ready. Thank you, Your Honor. My name is Carl Gunn. I represent Mr. Riggs. I'm going to try to reserve four minutes for rebuttal, if I can. The Confrontation Clause issues in this case are resolved by two key Supreme Court decisions, Washington v. Davis and the recent decision in Smith v. Arizona. I'd like to start with a second of those to respond to the government's response to my supplemental authority letter. It says there were no reports or notes by non-testifying biologists referenced. Can you move from Smith and address Davis first? If you would, Your Honor, I did want to point out one mistake in the supplemental authority letter, though, but I'll get to that later. Okay. Thank you. On Davis, Your Honor, I think you basically have two different domestic violence situations. And, of course, here we have a domestic violence case, the 404B evidence in question. You have the Davis case where it was held they weren't testimonial based on three facts, basically. First, there was an ongoing emergency, and it was about something that was happening right then. Second, the purpose of the statements was to stop the ongoing emergency. Third, it was basically a panicky 911 call rather than a more deliberate interview setting. Then you have the Hammond v. Indiana case, which is, to some extent, a mirror image of that. They're about an assault, and the court emphasized this, that it already happened as opposed to was happening. The purpose was to get information about that past assault, and the victim was basically safe and separate with the police in a separate room being interviewed, albeit not in a sort of formal recorded session. I guess my question is this. Did the district court in this case sort of specifically look at the two specific instances, prior instances, and carefully determine which particular statements would come in, or what happened there? No, it didn't, Your Honor. And that's part of the problem here. It just sort of looked at the fact that part of what was going on was looking at his injuries. And that was, frankly, mostly the paramedics as opposed to the police, though the police asked about him a couple times. And that's the big problem in this case. That's where I think the district court got confused. It looked at the Lattu case, and the Lattu case is all about asking about injuries. There's nothing about asking about the identity. And, in fact, one of the cases Lattu cites is the Seventh Circuit Norwood case, which had the district court doing exactly what the district court should have done here. Norwood's What should have? What should have happened? Yes. What should have happened, Your Honor, well, first, the most important thing that should have happened is the court should have excluded under the Confrontation Clause all statements to the police about the identity of the assailant. Sometimes that was naming Mr. Riggs. Sometimes it was referring to him as the roommate. Sometimes it was referring to him as the boyfriend. Those statements should have all been excluded. Maybe the statements to the paramedics about how he'd been hit in the head and he had bumps on his head and that stuff, that was probably admissible, though, frankly, I don't think it was relevant without the statements about the assailant. Well, my question is, I think, the exact same. I agree with your analysis overall, but isn't it your obligation to object statement by statement? If you've got a tangle of statements to first responders that are medics that are asking, as you just described, medical, those aren't testimonial, and then you've got interspersed first responder police looking into a crime, isn't it the obligation of you to object one by one and then move to redact the ones that are the police response statements? No, I don't think so, Your Honor, for two reasons. First of all, you can make the objection to all the statements. In Globo. Yes. I mean, there is an argument under Norwood. Norwood makes the statement that any and all statements to police officers should usually be excluded. So arguably under Norwood, it was proper to object to all the statements to the police. And, you know, if I object to, you know, a testimony that includes four statements, I'm wrong on one of them. That doesn't eliminate my objection on the other. Well, I guess it goes to me. I'm thinking it goes, but I appreciate this dialogue. It goes both to preservation and to harmlessness. In other words, if we have a video where a lot of statements implicating Riggs were made to EMTs, that could go to harmlessness in addition to whether or not it was your responsibility to say those come in, we've segregated and disentangled, and these don't. There's a premise there that both a premise and a legal that aren't satisfied here, Your Honor. First of all, there were no statements to the EMTs about who the assailant was. Okay. And, second, I think under Norwood, even statements to EMTs about who the assailant was should be excluded because it's not relevant to the medical treatment. So that's what Norwood says. In Norwood, what happened was— So no way harmless because nothing that went to the—okay, that's a good answer. But then at the front end, it's just I'm beating a dead horse. But you don't think it's—you can make an inglobal objection and then argue on appeal. You think that. And the government isn't saying you didn't preserve it. I would have thought that it would be better to object statement by statement when you've got some that are testimonial and some that aren't.  I mean, that certainly might have resulted in a more successful objection. But I don't think in terms of preserving, I have to say I object to Statement Y, I object to Statement B, I object to Statement C as opposed to saying I object to all of this, especially when there's an arguable basis for objecting to all of it. Under Norwood, there's an arguable basis that nothing that's said to police should come in because anything that's said to police would be recognized to be investigative. So I don't know if there's other questions the Court has about the other assaults evidence. I did want to make a couple points about Smith. Oh, no, I think we probably have a few more questions. All right. I mean, what about, again, just at the harmlessness stage, once Riggs takes the stand, I mean, I think my read is it's a pretty devastating cross of him. His theory about it being a seizure in the bathtub or a stranger coming in seems devastated by the forensic evidence, independent of this 404B, if we'll call it that, and you're not challenging that it is 404B. So here's the legal question. If you make an objection and you don't prevail, and then you therefore put your client on, can we still consider your client's testimony in the cross of him in terms of assessing harmlessness of the original decision? Do you see my point? Well, my client, of course, didn't make any testimony about the other assaults evidence. I know, but if his defenses are, if we decide overwhelming proof just from his cross. What you're saying is his testimony was so weak that it made overwhelming evidence. With the forensics. I think all that suggests, Your Honor, is that he was the one who caused the death of Mr. Martinez. What's missing here, and there's a great quote in my brief from the district court about how there's so many missing pieces here, there's no evidence of any murder. We have no idea. I think he said this is a circumstantial case or something to that effect. And he also said there's lots of missing pieces, there's no murder. The problem is what is left in doubt, regardless of Mr. Briggs' testimony, is what happened and how and with what intent. And that's why this other assaults evidence was so damaging. The prosecutor used that. She basically admitted no one else was there, we don't know what he was thinking, but look at this other assaults evidence to show his intent. And remember the standard here. It's harmless beyond a reasonable doubt. What this evidence did was it gave the jury an idea that what happened was intentional because there's lots of other possibilities. Did the government, I think you've described correctly what the government said in closing. I couldn't find the rebuttal. I'm not great always with the record. You couldn't find the rebuttal? The government's rebuttal. Did they return to how the jury should use the 404B evidence when they did rebuttal closing? Do you have a memory of that? No. I think it was, I looked, I only, I don't have a memory of it. I quoted from the opening argument in my brief, and I think if it was in the rebuttal argument, I would have quoted it. But they used it in their opening argument, and it was like basically the penultimate thing, if I can use a fancy word. It was like the second to last thing they said in their argument. So in terms of the sort of primacy and recency comment, it was sort of the last thing the jury heard from them. Your Honor, these are some of the scenarios that were floated during the discussion of the lesser included offense instructions. Actually, not just that. The forensic anthropologist, the government called, actually conceded it was possible that this happened from him falling or being pushed onto something. The defense counsel talked about these possibilities of a fight that's really just a, you know, physical fist fight, and someone falls over and hits their head. The district court hypothesized the possibility of what if, could the jury conclude based on the evidence that Mr. Riggs had been drinking and was severely intoxicated and something happened. Something happened with one of these implements that he may not have intended to cause death, but perhaps intended something else and death resulted. All of those possibilities were not affected at all by what the government argued was this sort of transparently false testimony Mr. Riggs gave. Mr. Riggs could have been getting up and lying because he was scared. He didn't want to admit accidentally causing a death. He could have gotten up and testified that way because he was scared and didn't want to admit negligently causing a death. There's lots of possibilities that would lead to a defendant testifying like that that fall short of intentional homicide. I don't think there's, you remember what the government said about this evidence and its motion? They called it critical three different times. Yeah, my legal question, mine was just a legal question at the outset, which is when there's a pretrial ruling and you had an extensive hearing on this issue where you did preserve your Confrontation Clause argument, but it's adverse to the defense, can an appellate court then decide harmlessness based on strategic decisions that had to have been made having lost that motion? You can consider Mr. Riggs' testimony in evaluating harmlessness, but that testimony does nothing to address how. It may be suggestive that he caused the death. It does nothing to suggest anything about his mens rea, and that's what they used the other assaults evidence for. It might be harmless. It was proper 404B then, absence of mistake, intent. I think it was a close call, but I haven't raised it. I mean, you know, defensive. But the point, there's no way this is harmless beyond a reasonable doubt, not when the government used it that way and not when no one was there to say what the intent was, regardless of what Mr. Riggs testified to. I did want to make one point, and, of course, there's also the DNA Confrontation Clause evidence, and I would submit that's also not harmless because that's what the government used to identify a murder weapon. That's what tied the blood on the pot to the injury of Mr. Martinez. But it was only the victim's blood, right? Right. It didn't tie to Riggs himself. No, but it suggested the pot was the murder weapon, and they used that in the closing argument to point to the murder weapon. There was also blood on the scissors. That's Mr. Martinez' blood. So he suggested maybe they were used in the mutilation. So that evidence wasn't harmless either, and I wanted to address, if I could, what the government said in its response to my supplemental authority letter because I couldn't respond to that in writing. The government says there were no reports or notes by non-testifying biologists referenced by the testifying expert. That is simply not correct. Every time the expert testified about a match, he compared the sample from the piece of evidence to, quote, the known samples from both the victim and the defendant. And then after that, he just used shorthand referring to comparing them to Mr. Martinez or to Mr. Riggs. So there definitely were reports of non-testifying experts referenced. There were definitely these known profile reports that were referenced in that testimony. And that makes this case fit squarely within Smith. I quoted language in my supplemental authority from Smith. That's what made the expert testimony useful to the prosecutor. If you don't know who the known profiles belong to, the testimony didn't point to Mr. Martinez at all. Counsel, if we agreed with you on part of your arguments, specifically the confrontation issues, wouldn't it make sense to send it back to the district court to consider Smith in light of, of course, their decision? Wouldn't it make sense to send it back to that court? I don't think so, Your Honor. I think the record is pretty clear. He relied on known profiles that he didn't generate. Those known profiles are critical to the testimony. They're the only thing that, in the words of Smith, makes it useful. They're the only, in the words of Smith again, that testimony would have, quote, counted for nothing, unquote, if those known profiles weren't correctly attributed to Mr. Martinez and Mr. Riggs. I don't see anything for the district court to resolve. It's there. It was wrong. They've got to call those underlying people. They've either got to have the person they call do the known profiles and the unknown profiles that he compares or they have to call the person, as they did in Williams, interestingly, who did the known profile to Sabosat Foundation and then the person who did the unknown profiles. Plus, I go back to the other assaults evidence, Your Honor. This really is just, it's like Hammond, not like Davis, and the other assaults evidence shouldn't have come in, and that's what the government had to show the mens rea. It's maybe not what the government needed to show Mr. Riggs caused the death, but it's what the government needed to show the mens rea he had when he caused the death. So that can't be harmless. And remember the standard here. The standard is harmless beyond a reasonable doubt. The question, in the words of the Ninth Circuit, is whether it significantly alters the evidentiary picture. It certainly significantly altered the evidentiary picture to have these other assaults in there and to give the government a murder weapon to point to. Both those prior incidents were just bad acts. They never led to prosecutions. Correct. And yet there were videos of both still available. It's sort of remarkable. Well, it was body cams because the Albuquerque police… They kept the body cams from cases that weren't even prosecuted? I don't know about police procedure, Your Honor, but they were less than five years old. It wasn't like 20 or 30 years ago. I have about four minutes left, which I'll save for rebuttal, unless the Court has other questions. We'll preserve your time. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Kaitlin Noel, and I represent the United States. I'll start with the Confrontation Clause issues. That's clearly the Court's interest here. But before I turn to the merits of those arguments, I do want to focus briefly on the harmlessness issue and the overwhelming evidence that was presented in this case. You only gave a paragraph to harmlessness in your brief. You cited one case. That wasn't very helpful. I will go over some of just the categories of evidence here. I know, but they're not in the brief, so it just makes it difficult. Of course, we read the whole trial record, but Benamor is the case you cited, and there the defendant admitted to the gun. So the statement of the landlord to the police looks pretty obviously harmless. That's not analogous. So what's your best case for harmlessness of this type of 404B evidence? Your Honor, I apologize. I don't have a specific case with this type of evidence. Because you agree. I mean, I kept thinking it's literary. I'm not good for you to say penultimate sounds so, but this does sound sort of like Hamlet's ghost. This is the guy coming from the grave saying Riggs is the one who's beating me up. It's hard to imagine it being constitutionally harmless. Well, just in terms of the issue of intent, which as far as the 404B evidence is really what that was relevant for, I just want to point out that the nature of the injuries themselves, the extensiveness of the really brutal wounds here, combined with the apparent efforts at concealment that Mr. Riggs took, both in terms of what appears to have been cleaning up the scene and then also what Your Honor noted was problematic testimony at trial, and finally that Mr. Riggs was aware of the defendant's brain injury that he had suffered. He both talked about it at the scene and also had just been at a medical appointment with the defendant. But if we're jumping to harmlessness, which is fine to do, do you disagree with his characterization of the government's closing, that it actually did draw attention to this 404B? It mentioned it, Your Honor, but this was between the government's close and rebuttal close. It covers about 40 pages of transcript, and there are just two paragraphs in total that reference the 404B. None in the rebuttal closing? None in the rebuttal closing. I was not—I did just take another look to check, and I didn't see anything. Oh, so you have—it is in the record, the rebuttal closing? The rebuttal closing is in the record. Okay. And, Your Honor, I did—the supplemental excerpts of record included the full trial transcript, in part because in light of my harmlessness argument, it feels like sort of everything is fair game, and so that is in the supplemental excerpts of record. But there was one paragraph where the government noted that this 404B evidence is just for a limited purpose, and then there's just one paragraph, a few lines of text that describe the evidence. So it is mentioned, but I don't think that this was sort of the big deal that it's being made out to be. And I'll turn—having covered the harmlessness point, I do want to talk some about the merits of the Confrontation Clause issue here. I recognize— So you are just—last question on homelessness. You are not arguing, and you didn't in the brief say, well, the statement to the EMT in the 404Bs came in anyway, and that comprehended incriminating evidence. The jury would have heard it anyway. You haven't made that argument. Your Honor, I do believe that I pointed out in my answering brief that the statements to the EMTs combined with the fact that one of the police officers did testify that they then encountered Mr. Riggs at the location, that based on that information that that would contribute to the harmlessness because this was information from which the jury could infer that that was connected. On the substance, though, obviously Davis and the companion case, Hammond, are important cases here, but I also think that the subsequent case of Michigan— Well, why isn't this closer to Hammond? Well, for a few reasons. Okay. I think that this is, in fact, closer to Davis. So looking at the facts in Hammond, police officers show up to the house. The wife is sitting outside, says everything's fine, no apparent injuries. When officers speak to— But I think the facts indicate that she was distraught, I think, or crying or something to that effect. I believe the case describes her as looking somewhat frightened. Right, frightened. But when the police go inside, she doesn't have any apparent injuries, which I do think is significant. In particular, it's significant because with the later decision in Bryant, the court notes that the existence of a medical emergency is part of the evaluation, the analysis of whether there is an ongoing emergency. So there do not appear to be any injuries to the wife. When the police speak with her at the time that they're talking, they already know who is the purported assailant, the husband, and they have one officer who is with the husband being kept separate from the wife. So the person, the assailant, is already, if not in custody, already under police control at that time. I guess here's one of the biggest problems I have here, that our case law, including those that you've listed, talk about a district court going through very carefully each individual statement that is admitted, and here there are two incidents, there doesn't seem to be that level of preciseness that is necessary. Some of these statements you might very well be admitted under the exceptions that exist, and under our case law, even the case law that the judge cited. But isn't that sort of the fundamental downfall of your position, that the judge really didn't do that precise as that's necessary, and that's dictated under our case law? Well, I think the problem there lies with the defendant's failure to identify any specific statements that it was objecting to. So the district court here really didn't have cause to sort of go through one step at a time. Yeah, I thought they filed a confrontation motion, didn't they? They did, Your Honor. I don't recall it. I guess my question is, which I believe was the judge's question, which is do they have to go through every single time, not only have the motion, but also later during the trial, imagine how silly that would be if you were in trial and you'd have to say, no, no, no, that I'm objecting to, and then sit down and wait for another question. Oh, no, no, I'm objecting to that. Is that what you think the law should or is that we require of our judges? No. What I do think is that if there is an expectation that the district court will do sort of a line-by-line analysis, that that analysis would be in response to a defendant saying this particular statement is problematic and then the district court evaluating that in response to that. Do you agree that the judge didn't do that here? I do agree with that, Your Honor. Okay. Factually, I just want to point out sort of going back to this idea of ongoing emergency and when the particular statements, because it sounds like the sort of general statements, the medical statements to the EMTs really isn't an issue. The issue is the identification of Mr. Riggs as the assailant. Well, it may not be an issue, and under our case law, in fact, the case that the judge cited, I mean those might very well come in, but we don't know that, right, because the judge didn't do that, didn't go through that analysis that is necessary to determine which statements come in and which statements stay out. Again, and I agree that that particular analysis line-by-line didn't happen here. So then isn't that a basis for us just on that to send it back to have that analysis to determine, you know, what should have come in? I don't think so because I think that this court can look at all of the statements and determine that none of them came in in error. And talking about the specific identifying statements in both situations, and again, I want to turn back to the Bryant case because in the Bryant case, police came upon someone who had been shot. It didn't seem like there was what they knew or what the victim told them was that it had happened somewhere else at a house. So it wasn't a situation where they were sort of coming across a fight that was going on at that moment. The shooting had already occurred. The police officers asked, what happened? Who did it? That and the victim responded. And the Supreme Court in Bryant held that in that situation where there is this ongoing emergency, you have someone who's injured, who needs medical assistance. You have an assailant who is not identified and who is at large, that when the police officers are responding and they're asking sort of those very initial questions just to figure out sort of what is the situation here, what is the risk. So what you're saying basically is that this is not like Hammond because we're not looking to whether or not the person making the statement, so for in this case Mr. Martinez and also the wife on the porch in Hammond, they are safe. Martinez was alone and in a separate space with the officers, which is why I think this looks a lot more like Hammond. But you're saying don't look at that. What we should be looking at is whether the assailant was in fact in custody or whether or not there needed to be efforts to apprehend that individual, and that's what makes it an ongoing emergency. I do think that that is part of what makes this an ongoing emergency, and I think that that makes this similar to Bryant. Aside from the fact that the injuries, you know, he is not shot in the abdomen, we have the police officers saying that they observed visible injuries on him. If you look at the video and the videos, the body cam videos were transmitted to the court, and it's clear from the record that the district court also took the time to view all of these videos in the course of the hearing on admissibility. But looking at those videos, the police officer, and I believe this is in the March incident in particular, one officer is sort of asking initial questions. The other one, you hear him on his radio, and he testified to this, like calling in to say, step up, we need the ambulance to get here more quickly, because as they testified, they really were concerned about his medical condition. But there was no threat to Mr. Martinez by Mr. Riggs at that point, right? Because he's in police custody and he's safe, there's no actual threat to Mr. Martinez on either the March 10th or November 14th incidents, right? In that particular moment, I would agree with that. I think Bryant also talks about the threat, any possible threat to the public or to the police officers who are responding. But it was clear that these were domestic incidents, wouldn't you agree? Once Mr. Riggs said that, yes. This wasn't a person going out there and starting beating up people on the street, was it? No. This wasn't a person who had a gun, was shooting all over the place, correct? That's correct. This was a domestic dispute, correct? It was. And it was clear at the beginning, wasn't it? I think it was clear early on in the November incident. This is the one in the hotel lobby. This actually, the identification happened very quickly in that incident. And I will note that that actually wasn't even in response to a police officer asking Mr. Riggs who did this instead. He just said, wow, looks like he really punched you right in the face. Well, I'm only responding, and I only ask you those questions because you are the one that's saying, well, no, no, no, it's protection of the public. So I guess I'm trying to understand what you mean. Well, I think first of all, I don't think it can be said that because something starts out as a domestic violence incident that that means that everyone else is safe. I think it's well-known that in responding to domestic violence incidents, there often are safety concerns for law enforcement. So I think the fact that just understanding who someone is that did this and where are they right now is relevant to the officer's safety. Other questions that were being asked by the officers were things like, well, I need to get this down for my report, right? I need to do this for my investigation. It was those seemed to be questions going towards an investigation, not an emergent situation for the purposes that you're arguing for, for the public, which are well-meaning, right? But is that what was happening here? And do those questions really take us to that point? Well, and I suppose, candidly, this kind of goes back to your prior point about going through the record one step at a time. But I think it also, in that sense – But doesn't it make sense to send it back for that reason alone? I think that that could be one reasonable outcome here. Okay. But I don't feel like I'm ready to concede this point because I think given – In other words, what's the limiting principle? Because police respond to 9-11, domestic disturbance all the time. So your rule of law that you ask us to write, Ninth Circuit published opinion, is that whenever police respond and victims and bystanders incriminate somebody, there's no right to confront and cross when finished the sentence. No, I think we still are looking at the primary purpose test. So I don't think – But when police respond, the purpose is they're responding to a 9-11 call. Presumably the possibility of a crime, and they're trying to find the facts pertaining to the crime. It's not testimonial because what? How would we write it so that it wouldn't basically allow police to testify without cross-examination of any incriminating testimony? It would be a massive ruling unless you can give a limiting principle. What's the limiting principle? I think the limiting principle is the principle that's already established in these Supreme Court cases that once the emergency – we retain the ongoing emergency rule, but we interpret it so that it is much broader. And I think Judge Higginson's question goes to – it doesn't make sense to say there's a limiting principle only – that's farcical. If an ongoing emergency really means something more than an ongoing emergency, what is – and you're asking us to interpret the existing principle to be broader than what I think the facts of these other cases suggest. How do we do that in this case and still preserve the holding of the other cases? I think that as to the application of the ongoing emergency doctrine in this case, the court could look at the totality of the circumstances and determine that at some point maybe the ongoing emergency had been abated and things had switched over and we were now in a different primary purpose of investigation. But the statements incriminating – the statements identifying Mr. Riggs as the assailant came in right at the beginnings of these conversations where there was still – we have no – the police are there and they're just, what's going on? What's the situation on the ground? What do we need to know about? And I think you're right about that. I think there are parts of these statements that perhaps should be rightly admitted, but because we don't have the methodical, careful description of which statements are admitted and which should not be admitted, I think our hands might be tied, don't you think? And again, I think that that could be one outcome that the panel could reach. I think there is another way to look at those initial portions of these conversations, these interactions with the police were ongoing emergency. That was the primary purpose, so they aren't problematic. The rest of it, maybe it shouldn't have come in, but at that point it's harmless because there isn't a problem as to the very beginning of those interactions where there is still an emergency. Was the opposing counsel right that he never said the name Riggs to the EMTs? I believe that that is correct, Your Honor. I was just re-watching the videos this morning, and again, if you look at the very first videos, there's sort of three videos per incident, and if you look at the very first ones, the identification of Mr. Riggs happens right at the beginning. In the November one, the officer just says something like, your face looks really bad, it really got you right in the face. Is it he or she? And then Mr. Martinez, the victim, just volunteers he, Brian Riggs. He just kind of spits that out. There isn't a formal questioning going on here. This is the police officer just sort of, what happened? You look hurt. Well, it goes to the ongoing emergency, and then at that point they knew that it was a domestic dispute, and they knew that it happened prior to that. They said, tell me what happened as a result of that. That seems more of sort of an investigation, but I see your time is up. Counsel, I don't know if there are any questions. All right, thank you. Thank you. Maybe to start off with that last point first, Your Honor, I respectfully read the record a little different. I laid out the timing of things, I think, pretty completely in my reply brief in footnote one. That last point about the he or she question, that's actually a minute into that meeting. And at the very beginning of these meetings, the officers are saying things like, for our investigation or for our reports, things like that. So, frankly, it seems pretty clear to me that from the very beginning, this is an investigation with a few side tangents into asking about the injuries. But those are separate from questions about the assailant. But they are asking those questions. They are. I mean, the officers are asking, do you need to go to the hospital? Do you need medical attention? And then to some of those responses, I think he might have said, yes, I was punched by X person. I guess I don't think so, Your Honor. The way I laid it out in my reply brief, and I think I got it pretty accurate, they're more segregated than that. The questions about, do you need to go to the hospital? Oh, what are these bumps on your heads? Are really not. Those are separate from questions about what happened, which is more focused for investigation. The other point I wanted to make was there was this discussion about the defendant or the assaulter still being sort of out there, and maybe that triggers Brian. I don't think it comes close to that. If you look at Hammond, it was true that the defendant in Hammond was in another room with the police, but that's only in the facts. If you look at their analysis and the reasons for their holding, what they talked about is the fact that the victim was safe with the police, and that was, of course, true here. It was the victim being with the police, not where the defendant was that mattered, and the domestic violence. Now, Brian was different because Brian wasn't a domestic violence with what the Bryant court characterized as a narrower focus of victims. You had a man, it's different in two really key respects. You had a man who was out there apparently willing to use a gun very readily going around with a gun. You didn't have anything like that here. You also, in that case, the victim was basically in a parking lot lying against the car bleeding to death, and different police officers were running up to him at different times sort of asking what happened, you know, where's the guy with the gun and that kind of thing. That doesn't approach our case here. Here what you have is they arrived at the hotel. Mr. Martinez was there. They knew he was the one who called 911. They knew they had to investigate and write a report. They took him to another location, in one case the hotel lobby, in one case the parking lot outside, and in the words of the officer when he testified, for our investigation, we interviewed him. And what they said to him during the questioning was, we've got to write a report, et cetera, et cetera. I agree that there were sort of, when they saw the bumps, then they asked about, you know, how he got hurt and stuff like that. But the questions really are pretty segregated between who did this and do you need medical care. And frankly, I mean, I guess the court could send that back, but it is de novo review, so I think your honors can do that as well. Those were the main points I had, I think, unless your honors had other questions. All right. Thank you. I want to thank counsel for their argument today. This matter will stand submitted. And I believe that concludes our day. Thank you.
judges: Higginson, MENDOZA, DESAI